Good morning ladies and gentlemen. We're here for our oral arguments and I see we have the attorneys for the first case which is Dean against Wexford Health Sources and others. A couple of docket numbers 23058, 23139 and before we begin let me just assure you that if we run into technological glitches we will make whatever accommodations are necessary for the timing of people's arguments but hopefully there will be no such glitches and so we are ready when you're ready Mr. Eaton to hear from you. Good morning your honors may please support my name is Tim Eaton and I represent the defendants appellants. Your honors this case was supposed to be about whether defendants treatment of plaintiff's renal cancer was unnecessarily delayed because the defendant physicians believe that when plaintiff went to sick call for a painless hematura in late December 2015 this condition was a manifestation of his current kidney problems which had been he'd been experienced in 2003 in which he had been treated for a while in prison rather than early signs of renal cancer. Mr. Eaton it would be helpful for me at least if as you present your argument you make it clear which points you're making that pertain to the two individual doctors Dr. Nowar and Dr. Einwohner and which points pertain to Wexford itself because obviously the jury drew quite a distinction between the individual doctors on the one side and the company on the other side in its punitive damage award and at least it seems to me the arguments are slightly different. I'd be happy to do that your honor so when I referred to the fact that there was an issue as to whether or not certain physicians of Wexford treated him properly at the beginning I was referring to Dr. Nowar because he saw him on December 23rd 2015. Dr. Einwohner on the other hand had been treating him since 2014 for a kidney problem and in fact he had had a CT scan which she had ordered in July of 2015 before he saw Dr. Nowar so there had been a medical history and the course of treatment Dr. Nowar was the medical director at Taylorville but your honors once the Mr. Eaton, can I ask you a question? I'm interested in these Lippert reports of course. Yes sir. And they came in ostensibly for the purpose of notice but clearly they were argued at least in my opinion they were argued for the truth of what was in the reports but was notice ever an issue in this case was it now I look at the jury instructions and I understand that with respect to the against Wexford the district judge instructed that the plaintiff had to prove that the lack of reasonable measures to treat the plaintiff serious medical need was a known or obvious consequence of the application of the policy which I think here was the collegial review policy but was was there ever there's there's evidence of notice clearly Dr. Nowar was a good bit about dumping out of Wexford but was notice ever an issue in this case that would necessitate the Lippert report coming in for that purpose? Yes yes it was your honor and for this reason there was no evidence presented by the plaintiff other than through Dr. Nowar's frustration and criticism of the collegial review process that related to anyone other than this particular plaintiff is as a matter of fact when Dr. Barnett who was plaintiff's expert on collegial review testified he said that the process didn't work as applied to this plaintiff so the issue of notice as to whether or not this policy had affected anyone else or had risen to the level of the constitutional deprivation was in play and there was no other evidence other than the Lippert reports that perhaps this has been an issue anywhere else. I wondered about that though Mr. Eden it did seem to me that there was other testimony aside from the report and the other thing about the reports that concerns me from the point of view of your argument is that the trial court did issue a limiting instruction and we give a great deal of deference to those limiting instructions and so I'm not sure why this is the time to deviate from that rule. Your honor I'm aware of the curative instruction but I also know this court has found in certain cases that even where a jury has been instructed the prejudice so much that the curative instruction or jury instruction cannot overcome it and in this case I think this is one of those instances. What you're essentially arguing I put this in a slightly broader context people certainly do raise for evidence rule 403 arguments and they appropriately raise them before a district court who will then weigh the probative value for the legitimate purpose your notice against the prejudicial impact that's another thing that we give tremendous deference to the district court on. Your honor in this particular case as I pointed out as we pointed out in our brief and as I will argue today the difficulty with having notice even with the instruction is that the second liquid report which was also admitted for the purpose of notice was written and issued in October of 2018. No I understood that you that you made that argument but I went back and looked at the second report and the nothing has changed and so it's not as though they were introducing new information that of course you know Westford had no reason and the doctors had no reason to know of something that hadn't happened yet but in fact the second report the poises report is complaining that nothing has happened that we're still in the same situation we were when the Shansky report came out. But your honor the poises report reached an entirely different conclusion as a matter of fact when the court appointed poises he said that you may arrive at different solutions or opinions than Shansky you don't have to just follow up where he left off and if you look at this Shansky report Shansky was talking about scheduling off-site services and in that recommendation he's talking about you need a logbook to keep track of these services you need to make sure the record-keeping is accurate etc and he goes through various reasons why things should be done differently. Poises rejects all of that in his conclusion is it's a patient safety hazard and it should be abandoned and that conclusion was a conclusion that the plaintiffs counsel mentioned six different times before this jury. It didn't seem with the Shansky report the 2014 report that the jury addressed anything about the harm that collegial review might cause. It talked about the problems with it but what went to the jury didn't go on to address harm compared to the 2018 report which made a very strong statement about the harm. Is that a fair characterization? Yes yes it wasn't until the 18 report where they suggested that it could be a safety hazard to the patient and in terms of notice to go back to Judge Kirsch's original question was was notice an issue and it certainly was. We did not have notice when he was being treated between 2015 and 2017 that the process of scheduling off-site services was somehow a patient safety hazard. It's a notice and just about the 2014 report because I think there's a significant issue with the 2018 but the 2014 report that was admitted on the question of notice it it was used in the conclusions talked about the delay isn't that something that an inference a jury that there's a problem with this delay in terms of health care? Your honor I think in terms of the issue of delay Shansky has suggested ways in which the process could be improved. There was issues about what Judge St. Eve is asking is that the way the jury had to hear it? Obviously we're here reviewing a some of your brief reads as though you are asking us to just be the jury and read the evidence differently but I think the Shansky report logically could lead to the inference that what was happening with was inadequate and that there that you were on notice that it was inadequate. But your honor what Shansky said was that some institutions that we reviewed there were problems but not all. For example if there's a quote in the Shansky report that says additionally although some of the facilities were tracking these steps fairly conscientiously others were not. But wouldn't that be a weight issue? Mr. Eaton wouldn't that be a weight issue because the institution where Mr. Dean was I think we all agree was not an issue in the Shansky report. So wouldn't that be a weight question as to what impact the jury decided to draw from that in terms of notice? In part your honor but as you know as we say in our brief Taylorville was never mentioned or never examined. And I think you brought that out during cross-examination. I'm sorry. I'm sorry I think that was elicited that fact that Taylorville was not part of this was elicited before the jury. Right. The problem with using this for notice is that there is no way in which we could have challenged any of the assertions in that report because they could not be the authors of the report could not be cross-examined pursuant to the order that was entered when they were appointed. But you challenged them and didn't you challenge them through other witnesses? I know you could not call the expert who wrote the report Shansky as a witness and my guess is you may not have wanted to. But didn't you challenge the conclusions and the information that was used for notice through other witnesses? There was only one witness who testified to your honor and as counsel pointed out in their brief the court decided to admit them for notice purposes on the fifth day of the seven-day trial. It was when our principal witness on collegial review Dr. Ritz was on the stand and he was asked by counsel have you heard of these reports and he said yes. He wasn't asked when he heard about the Pucic report. He was being questioned in 2019. He didn't say he was aware of it obviously prior to that time and he said he disagreed with some of the conclusions. The district court didn't preclude you in any limine rulings or otherwise from calling other witnesses to challenge the information in these reports did it? Or to challenge the fact that there was that this information has been placed in front of Westford and thus it knew again sticking to notice never mind the truth of the matter which which I don't think we should spill over into. But was Westford aware that this was a foot basically and seems that the rational jury could think yes. Westford certainly would have been aware of the Shansky report based which was issued in 2014. Westford was not a party at the time it was issued. In fact Westford was not a party when Dr. Shansky was first appointed in that case. However in the 2000s. Westford has been the contracting agency for the prisons for quite some time. They have been but there was more to that report than just Westford. Obviously IDOC was I'm sorry the only Department of Corrections was the focus on the Lippert reports. They also criticized IDOC for overcrowding and nothing to do with Westford for certain conditions at the prison in terms of scheduling and in terms of the size of the room would they have to call in nothing to do with Westford. So there were a lot of conclusions that related only to IDOC only and not to Westford. And so again I am NOT suggesting to this court that the Shansky report or even the Puget Report could never be used for notice purposes. I'm just stating that in this particular instance I think it was inappropriate because also just saying to your question were we precluded from putting on any of the witnesses. This was the fifth day of the trial. We didn't know whether the court was going to allow Lippert in as notices. In fact it never happened before. I think this is the only case to date where Lippert has been admitted as evidence for any reason even for notice. So you're saying that you got to the fifth day of the trial without any consideration on your part or in pretrial orders about the use of the Lippert reports? Well it has certainly been raised as an issue because we filed a Martial Limony but it was not ruled upon till the very day of Dr. Ritz's testimony and we asked a few questions about it. We had no opportunity to prepare him if it was coming in for the truth or for notice and so... I don't understand how you say you had no... I mean if you had the motion in limony, you haven't gotten the ruling yet, wouldn't you have been prepared for it to come in either way? You know on notice, for the truth, you know any other permissible ground? Well Your Honor, I think as I just stated where it had never been permitted before and read the strong language of other courts and district courts where they said that it shouldn't come in because of this highly prejudicial value to juries. In fact there had been a subsequent to this case there was a federal judge, excuse me, a federal magistrate that said it was so prejudicial couldn't be subject to cross-examination that shouldn't come in for any reason because if the way it was being used and that is to show the truth of it even though there's this curative instruction that I know Your Honor said they were instructed but it would not make any sense if it was notice only for plaintiff's counsel to repeatedly refer to the conclusion and conclusions that it was a different times with Dr. Ritz and in closing that these were independent experts as opposed to experts that are being called in litigation and so that certainly shaded over into the matter of the truth and furthermore in order to show that the process of collegial review constitutes deliberate indifference there are two showings they have to make. One they have to show some type of other than to this particular plaintiff that's what the testimony related to and secondly that they were on notice. They tried to use lipid for both and that was a problem with this case. Can I just ask you a question about the deliberate indifference standard. As I understand the plaintiff's arguments you know essentially the problem with collegial review is that Wexford was using it as one size fits all and you know so if somebody you know breaks his index finger you know maybe maybe you can wait a little bit you know or somebody you know just has a bad sore throat maybe you can wait for a little bit but if somebody has something risking metastatic cancer and there's the CT scan which finally happens months and casual one-size-fits-all could be seen by a jury as objectively deliberately indifferent and then you have to talk to people about whether they were implementing it and deliberately in different way and the jury heard testimony to that effect. The jury might have ruled for you I don't think this case is at all easy in that sense but the jury chose to rule for the other side. Your Honor, on April 14th when Dr. Severino who was the outside urologist performed the CT scan and found the cancer and notified the prison he said it was non-emergent and if it had been something that was other than non-emergent yes collegial review would not have applied. They were treating it as if it were kidney stone problem based on medical history which I don't think it's so far out of the bounds of professional judgment to plan a course of treatment. You have testimony to that effect but wasn't there evidence on the other side that given the amount of blood and blood clots and so on it was outside the scope of medical judgment not to ask for the CT scan sooner. Your Honor, I don't believe they said it was outside the scope of medical judgment what they said was a breach of the standard of care and medical malpractice does not equate necessarily with indifference because it's not a federal right and there was a state court excuse me a state count on medical malpractice which the jury decided against the two expert physicians they were and I'm Bonner we're not challenging that on the facts we're thinking that Lippert so prejudiced that finding that we should be entitled to new trial on that as well but on the this is not an Eighth Amendment and not every medical malpractice case arises to the denial of a federal right. Mr. Eaton, I want to go back to what you said a moment ago about proving up a systemic issue so what's at issue here is the policy of collegial review and we said recently in the Howell case that the collegial review policy is not unconstitutional on its face yes so that alone is not sufficient to to exactly what is required to establish institutional delivered indifference based on a policy that on its face is not unconstitutional so what exactly under our case law is required to meet that delivered indifference standard for the institution? Your Honor, I first have to agree it's not entirely clear in the Hilbert case where it was dealing with whether or not the inmate was getting his prescription medicines a majority of the court found that there was no widespread deficiency with respect to that issue and there were at least I think three different times where he didn't receive his prescriptions so the issue is not clear-cut in Howell I think the court was influenced by the doctor who said that he didn't think the ACL surgery was necessary so I think you have to look at the facts in the medical judgment it was issued by the way Dr. Severino who inherited this case or took over this case I should say on March 10th three months after approximately three months after he'd initially gone in with this problem the sick call at that point in time he took charge of getting ready for the surgery and he said and when he testified and he was not sued that I'm not going to rush this thing because I don't want him to die on the table I'm going to line up the people I need to have a successful surgery and by all accounts it was nine hour surgery nine different positions you know there was a suggestion as I've expected maybe three years he's still alive I mean there's there's all sorts of things you have to look at the circumstances here in terms of this care there was also a deliberate indifference back to the deliberate indifference standards if assuming plaintiffs had sufficient evidence to show that the collegial review process as to mr. Dean resulted in poor medical care or that he can meet that that standard as to the collegial review process what since it's not unconstitutional on its face what more is required under the law for the plaintiffs to prove and I'm looking at some of our prior cases Davis versus Carter being one of them where we talked about establishing the widespread customer policy that you don't have to show that the policy at issue routinely interfered or caused eighth amendment problems for other inmates that you just have to show that the policy applied to other inmates so is it enough if they can show that this policy caused the care issues for mr. Dean plus this policy was widespread at the institution or if there's nothing more and if it's something more what is it I think as this court said in how when they were affidavits from other inmates who had had similar issues to mr. how I think they were complained about physical therapy as I recall and the court said something more needed to be done to show that this policy in that case whether or not how they were treated was enough there should have been some evidence it seems to me by mr. Dean the collegial review it caused problems with other inmates other than just in this one instance and by the way plaintiff's expert on collegial review said I'm not opposed to the policy in fact we use it in California what I am testifying to is as it was applied to mr. Dean it was deficient and the jury found that they violated the standard of care by awarding money in the medical malpractice case the question which I know you're asking is at what point does that arise to an eighth amendment violation and I would say it has to be more than just an individual who it may they may have not met the standard of care but it's not something that's a widespread deficiency and I think that was the prejudice by the liver report because that seems to try to fill in that gap that there had been other instances of it your honors I see I have about five minutes left I'd like to fine Thank You mr. Eaton mr. Martin good morning may it please the court my name is Craig Martin I let me begin here with regard to the conversation that we were you all were just having there was a deliberate indifference instruction that instruction was not challenged by the defendant not objected to and any challenge to it would be waived on appeal mr. Martin can I can I issue a question regarding that instruction I guess there's there is no issue with the instruction the issue seems to me after Howell but I'm interested in your take on Howell the conflating of and this is where it becomes sort of a matter of law in my opinion under the deliberate indifference standard but conflating of the standard of care and deliberate indifference and your closing argument which was it was very effective it was very effective I'm not being critical of it at all but it does repeatedly conflate the standard of care with the policy and with an argument of medical indifference and it could certainly have left the jury with the impression that an Eighth Amendment violation occurs when the defendants violate the standard of care and what what I'm really interested in here is the is the role that the outside experts play here the outside doctors because what what we wrote in Howell we as judge Saney said we policies not on constitutional on its face but there's a paragraph that talks about the medical treatment was consistent with the medical advice from the outside orthopedic surgeon and then it says this exercise of medical judgment by the outside specialist makes it difficult at best to show that Wexford's delay in going through with the surgery amounted to deliberate indifference to Howell's serious medical needs distinguishing between the standard of care and total indifference to medical judgment does not equal standard of care does not equal deliberate indifference but what what what so explain that to me in the context of your closing argument explain the context and what was the jury supposed to understand here in terms of how do they not conflate standard of care and medical indifference in this trial oh I don't think that they do and I think the there's a short answer and there's probably a longer answer to your question the short answer is that a properly instructed jury with regard to the evidence that is before it interpreted the facts weighed the facts weighed the evidence and made a conclusion there was nothing as your honor pointed out there was nothing improper about that instruction on deliberate indifference it captured the law captured the law accurately there was no objection to it and it is waived now as a practical matter with respect to the theoretical legal question I deliberate indifference has an element of consciousness to it that regular negligence would not or a standard of care would not so it's the element of consciousness that is really what gets you into deliberate indifference and then taking it your honor this is the to the facts of this case with respect to the facts of this particular case there is a short version and a longer version and I'm going to give you both the short version is that you have dr. in particular dr. Newar's testimony and dr. the testimony of dr. Newar as he's been there for a long time he's been doing this for a long time and dr. Newar repeatedly talks about collegial review how decisions are always made in Pittsburgh how he cannot do things the way he would want to do things the way he would do things in private practice and talks about the delays of collegial review and the costs associated with collegial review and dr. Newar's testimony if you take a look at it is quite colorful with regard to that giving the jury not only conscious disregard with regard to this particular individual mr. Dean but giving the jury enough evidence to make a very reasonable inference that there's conscious indifference with regard to all inmates subject to this same policy because of the way Wexford applies it the that's dr. Newar's testimony with particular case we presented to the jury that there was I think 24 instances of collegial review prior to the time he had his surgery 24 we presented to the jury that took 207 days from December of 2015 until he had his surgery we presented we presented to the jury what was the exact delay in his treatment that was caused by the collegial review process he had all these collegial reviews that were approved and he got the treatment but and I don't think you could start back from December because the collegial review process didn't kick in until January December we're talking about a medical judgment on the part of dr. in the war we're not talking about collegial review so from the time the collegial review started in January or was recommended in January what exactly was it about that review that caused the delay in mr. Dean's care okay so let me go through the evidence a little bit on collegial review generally and get to that particular point in time the evidence on collegial review at trial let me frame it out first all right going into the trial and here's where we stood on and I'll get I'll get there but going into trial here's where we stood on collegial review the witnesses and 30b6 depositions from Wexford had testified that they knew nothing about mr. Dean's collegial reviews no memories whatsoever okay they also testified and they did this at trial that 85 to 90 percent of collegial reviews were completely perfunctory and meaning that they serve no medical purpose or no peniological purpose then with regard to documents the document production on collegial review was late and was sloppy and the court said that during the trial while she was ruling and in terms of the document review just to frame out the issues the document review came on there was a document review that came on Friday before a Monday trial which caused a lot of there's a lot of energy about and I'll come back and talk about that more with regard to Lippert then when you get to collegial when you get to the timeline that we're talking about here on December 23rd 2015 mr. Dean goes to dr. new or he presents with gross hematuria dr. new or tells him that dealer cancer or kidney stones and he took and he testifies at trial that he should go see a urologist that's what his opinion was the that gets sent to collegial review and it doesn't get sent to collegial review in a very timely manner the collegial review ultimately takes place I think on January 13th 2016 and that by that time he has also seen by video just like we're doing here today he's seen by video the nephrologist dr. Einbacher and dr. Einbacher testifies and talks about how I you see a urologist and you get a and she sends an email to dr. Ritz saying that this should go to get to collegial review he gets to collegial review there's no real testimony or any evidence with regard to what is discussed who is there nothing meaningful all you know is they come out of collegial review and they don't send them to a urologist and they don't send him to a to go get a CAT scan but mr. Martin how they some of that some of that had to do with the fact that the ultrasound was misread right I mean the problem I'm having here is with an 8th amendment violation in the timeline your client goes on 2023 2015 he sees the doctor on January 13th there's a collegial review they decide on an ultrasound so the doctors do exercise some medical judgment even if they're wrong and even if other doctors disagree with them they exercise medical judgment he has the ultrasound on February 2nd and the ultrasound is misread and so everything changes based on the radiologist who misreads the ultrasound and and that changes things and then on March 10th dr. Severino gets involved and doesn't Howell have some role to play once dr. Severino gets involved on March 10th I know your honor and with respect to well let me start with your timeline and the presumption of your question and if you could at some point in there mr. Martin you still haven't answered my earlier question I think it links up with what judge Kirsch is asking you about what was the delay in his treatment that was caused by the collegial review process that resulted in his injury there were you've talked about flaws in the collegial review process and I think we can all agree that that process it has its kinks and could be run better but that's not enough for deliberate indifference against an institution you have to show that that collegial review process the policy at issue caused the is what caused his injury here and I still am not sure what your theory is on that versus the standard of care being a problem well with regard to look the with regard to the I'll take the very first collegial review with regard to the collegial review the standard of care at that time is urologist send them to a urologist and go ahead and get a scan wasn't the testimony and didn't doctor I went our say get the imaging and then go to the urologist because the urologist isn't going to be able to do anything without the imaging so I don't recall and correctly if I'm wrong I don't recall any expert coming in saying that it was deliberately indifferent or that you would get the ultrasound or whatever imaging is ordered first before going to the urologist and you need some type of expert testimony I think if that's your theory to show that that alone was beyond what was acceptable in the medical profession so I think dr. Darr is the expert that gives you that testimony here's the urologist that testifies and she testifies as the standard of care and the standard of care is to go to urologist and get a CAT scan and that is what I'm Bonner essentially testifies to and what new are testifies to that's the point you just raised that is what imaging should have been done not should you've gotten the imaging before after seeing the urologist because you were arguing before it was a problem that they didn't immediately send him to a urologist and I didn't see any expert saying well you have to go to the urologist before the imaging is performed I thought your argument and maybe I was misreading was that based on your outside experts testimony that the first step should have been and it was indeed deliberately indifferent for the first step to be an ultrasound as opposed to a CT scan the CT scan was going to show what needed to be shown yes or no I mean who knew but that was actually an embedded problem by the time the technician reports no evidence of cancer ultrasounds just don't show things the way CT scans do so judge would you've stated it more clearly than I did that is that is what the argument is the standard of care is not to go get an ultrasound standard but again we're talking about negligence when we talk about standard of care we're talking about negligence I understand that but the question is what is deliberately indifferent what is the total lack of medical judgment she didn't send him for an x-ray on his foot she sent him for a sent him for an ultrasound that is the exercise of medical judgment even if that isn't the right test there is testimony that injecting dye in somebody of his with his comorbidities six months after they just injected him with dye and didn't find any cancer there's some risk to that and maybe the better course of treatment is to do an ultrasound first which by the way should have caught the cancer I think we all agree with that right we don't agree with that we don't we don't agree with what that the ultrasound should have caught the cancer no the ultrasound the ultrasound does not rule in or rule out cancer it can show mass that is not the standard of care okay with regard to this good I'm talking about the specific ultrasound in this case I thought there was testimony the ultrasound in this case showed the cancer and it's a 50% chance it might show it in a 50% chance it might not if the ultrasound I mean look the ultrasound is not the standard of care and the ultrasound doesn't show cancer or rule out cancer that's the evidence in this case mr. Martin let me maybe try to since time leaves quickly it is certainly true we all know I'm sure you would concede that simply showing a failure to meet the standard of care doesn't get you all the way home to an amendment violation it's probably also true that every time you can show deliberate indifference and the right kind of causation embedded in there there's also a problem of standard of care but focusing here I think what you need to tell us is why did the repeated use maybe it's not even just one time why did the repeated use of collegial review constitute something that a Wexford's adoption of a deliberately indifferent policy not one that would responsibly discharge its duties as the medical providers so collegial review in this case with regard to the multiple times of collegial review that went on there is no record evidence and the jury concluded what it concluded but there's no record evidence that there's any medical discussion that goes on during collegial review so you're very good you first of all I think you're saying that we can't just look at one instance or another instance of collegial review we have to look at it as a policy of Wexford and secondly I the jury permitted it to conclude that it just builds lots of delay into the system unjustified from a medical point of view on this record yes and if look there's zero evidence in the record with regard to anyone testifying about any of the collegial reviews in this case there's the 85 to 90 percent of collegial reviews are completely perfunctory and there's also evidence that explains why they do that so going back to that ultrasound versus cat scan versus urologist issue if Wexford sends mr. Dean to a urologist or to a cat scan it comes out of Wexford's profit line that's what the testimony was in the case if they have an image a urology image or an ultrasound image it goes on campus if you will but they do that but they do that they do that here that's where I get hung up on a medical indifference so he goes for an ultrasound the ultrasound is misread they then have a collegial review and they decide to refer him to a urologist for what's called a cystos I don't know how to say it in mr. Martin I don't think you do either I read that in your closing argument cystoscopy I think something like that but then on March 10th he sees the urologist dr. Severino and then he gets a CT scan right that's that's the problem I have from a medical indifference standpoint how do we square that with howls this exercise of medical judgment by the outside specialist dr. Severino makes it difficult at best to show the Wexford's delay in going through with the surgery or the delay in getting to the surgery amounted to deliberate indifference to deems serious medical needs how do we square what happens here once Severino gets involved with what happened in how well at once Severino is involved Severino starts moving it toward surgery right that's in the record right and all of the all of the points your honor that you're making here today were made in front of the jury for them to determine in a factual way but when you're when you're pre Severino the the notion of going to a ultrasound as opposed to a urologist or a CAD scan you you can't assume or presume that there's some medical judgment that comes out of collegial review the falsity of the collegial review story which by the way was put into play at the very beginning of the case by the defendant when they said collegial review is essentially perfect and that it's baked into the contract which it's not there's no evidence that there's any meaningful medical judgment going on during collegial review and mr. Martin that might be correct and again the collegial review process looks like it has its issues but just not having medical judgment exercised at the collegial review process can't be alone to it can't be sufficient on its own to establish deliberate indifference we know that the collegial review process itself the policy itself is not that went for collegial review was granted that he received the treatment that the collegial review board reviewed for approval they approval they approved it and he got it so you have to show something more you have to show that that delay whatever the delay was caused by first of all that it was a delay and second that it caused his injury here and that's what I'm in light of some of the points that judge Kirsch just pointed out dr. serrano you know coming in the misread film by an outside expert what is your evidence that this the outside collegial review and which we can all agree it's not perfect that any delays caused by that actually caused the injury here so I think here's rather than just saying well collegial review is bad if that can't be enough okay so collegial review serves no like point one it serves no valid medical purpose there is no evidence that may be true but again that doesn't get you across the line because that's not unconstitutional by so are you arguing that whether you take it from January 13 or whether perhaps you take it from March 22nd when dr. Severino's requests are considered in collegial review you still don't wind up having the surgery until July 19th and so there's a time factor there that the collegial review and I also had a question for you to what extent was the jury told about the economic incentives that you alluded to a moment ago that you know Wexford I guess they're paid on a capitation basis right for the number of prisoners and so their economic incentive is not to provide care because it hits their each collegial review serve no medical purpose and imposed delay that delay as I said earlier took you from 207 days to 47 days so that's that's the differential that was argued to the jury in the jury found with regard to cost there was extensive trial testimony with regard to cost and it came in in several different ways the Wexford contract is a 1.3 billion dollar contract over 10 million dollars a year the way the Wexford contract is structured and essentially the way it works is that they're paid to take care of the inmate population certain things are included in the contract included in the fixed fee if you will if they do certain other things it's on Wexford's nickel it cuts into their profit margin so for example the two things that are relevant in this case is going to a urologist and getting a cat scan off campus come out of what Wexford's profit margin urology or ultrasound on campus does not come out of their profit margin there was also testimony in this case specific to mr. Dean with respect to Wexford after his cancer surgery after his cancer surgery he went on chemotherapy drugs and there's a whole line of cross-examination with regard to how Wexford does not want to give him expensive cancer medication drugs $15,000 a month and instead would prefer to have him on palliative care in order to comment they wanted him in hospice right right how to care about that is deliberate corporate indifference and there was collegial review during that process too that had no medical purpose and just injected delay to his chemotherapy mr. Arnaud before we get to the post-surgery can we talk about the leopard reports for one minute I have some questions about the leopard reports particularly the second the second report in the relevance of the report and again your closing argument is very effective on the reports this is very very bad evidence for Wexford and you point that out effectively in your closing arguments particularly pages 13 11 and 13 12 where you talk about dr. I don't know how to say his name PUIS is and his team and you talk about how they're an independent expert and they go in and they determine that collegial review is a patient safety hazard and should be abandoned until patient safety is insured and then you remind the jury that they're going to have these reports in the jury room with them what was the relevance of the 2018 report under a strict 401 analysis the relevance with PUIS report I think the way you say it is that it is relevant to Wexford first relevant to Wexford's notice of the problems with collegial review I don't think you can I don't think you can combine the two reports because that's a fair argument on the 2014 report but the 2018 report came after the fact came different for so how could that possibly be relevant to notice if it was created and issued after what they were supposedly on notice of it well the the the words of that report itself I agree with you with respect to with respect to the report and the ongoing report dr. Ritz for example was deposed in 2018 in that case he knew about what was going on in 2018 the event question here took place before that the fuses report was issued after the events here so how could that possibly put Wexford on notice well the events here to just to make sure we do the timeline the events go all the way into 2017 with regard to the cancer drugs and so forth well except that the report was 2018 that's after the event and I think the last collegial review was sometime in 2016 late 2016 so how would the 2018 report possibly put Wexford on notice of or is it the content you know if there was a sentence in the report just to make it too obvious in which it said in 2016 Wexford knew that collegial review rarely changed outcomes and was a waste of time period well that would be some evidence that Wexford that somebody thought that anyway at Wexford whether you take that for the truth or not is the next difficult question but are you trying to do you have to get into the contents of the report or is it the existence of the report itself that creates the notice well I think the the contents of the report that create the notice as you go along and Wexford is deeply involved in those both of those reports but it was issued in 2018 how can the content put Wexford on notice well the it's the content that they're actually going through that investigation because they're actually deposed in it and in fact you know to be quite blunt about it their trial counsel misled the court about whether they were a party in that litigation initially so with regard to those reports the reports put them on notice but there's one I only the reports that I want to make sure is not lost and that is in our brief we point out that not only I mean let me say it like this the reports with regard to collegial review are relevant on and notice to the way wax Wexford actually presented the evidence to the jury Wexford came to the trial and said that collegial review was a perfect system they had their witnesses testify that it was a perfect system and their witnesses knew that it was not and that issue not only goes to did they open the door but it also goes to the award but the question is going to be whether or not the witnesses knew that at the time mr. Dean was going through his process and the findings from the 2018 report that were admitted that were quite different from the findings in the 2014 report weren't issued until 2018 after mr. Dean had had all of the treatments at issue in this case I don't know how that could possibly put Wexford on notice because what was admitted before the jury wasn't information about what was going on to reach the conclusion the finding that the collegial review process was a patient safety hazard and should be abandoned was issued and presented before the jury I don't know how that possibly could have put Wexford on notice back in 2016 of anything well right the so I'll just stick with the prior answer that I've given with regard to that and this is the contents of the report and Wexford is involved in them and I'd encourage you to look at dr. Ritz's testimony on it the other conclusion that is a specific finding and I didn't see anything in dr. Ritz's testimony or anybody else's that they were aware in 2016 of that specific finding and I think that's your notice problem right well he does he does not he does not give a time frame for what notice he has of different things and when in that testimony and no one further examine some other than me but the report and the finding wasn't issued until through 2018 so I think there I don't know how you could argue otherwise without testimony suggesting that so I'll prolong it another second and certainly adjust for mr. Eden as well but that's why I wanted to know about the content because if the content said for example you know on July 1st 2016 Wexford received a complaint about something or other I mean you you wouldn't that would be some evidence that Wexford had been told about so that's why I'm wondering whether again the focus isn't as a you know there's a 2021 report tell Wexford anything about what happened in 2016 certainly not but if that's not how you were trying to use it then it's a different proposition there the record does not have that evidence that it does that the second report is backward looking for sure and examining examining things after the first report was issued in 2014 but the record does not have in it as it as it is right now that in 2015 these events occurred but that is the time frames that they're examining 2015 2016 and so forth coming it up with that report but jury what was not factual information about what they were looking at in 2016 it is the doctors finding an opinion that the collegial review process is a patient safety hazard right I understand the point the other if I may just make the last point in our briefs we argue and we argued at trial that these reliable evidence with regard to collegial review and if you'll give me one moment to just quickly explain that with regard to collegial review as I said dr. Ritz and the others from Wexford testified that they had zero memory of any collegial review 85% to 90% of them were perfunctory the document production in the case came late it was sloppy and you could conclude that it's either they either created documents and didn't produce them they created documents and destroyed them or they never created documents there was ample evidence with regard to all the documents of Khaleed to evidence collegial review that would have been created had they followed their policy and there's different mr. Martin 807 is a hearsay rule and it's the residual exception that puts that looks at the trustworthiness of the underlying documents it's not a sanction for a discovery abuse or a discover bad behavior in discovery I have never seen and I looked at this any court use rule 807 as a sanction for discovery abuse and in fact that would seem to undermine the whole purpose of rule 807 which is to admit hearsay that has some underlying trustworthiness right the reason I'm making a rule 37 argument which should have been made to the district court during discovery I'm your honor I agree with your point but the there were two motions going on at the beginning of trial one was to exclude the X leopard reports the other was actually a discovery motion based on the same sanctions essentially and then at asking for an adverse interest in the failure to produce evidence the reason I set it up like that sanctions rule 87 is a trustworthiness issue exactly and I agree and the reason I set it up like that is because in the context of this trial the most reliable evidence with regard to collegial review was I could be viewed as the leopard reports what you had is you had very ample and full evidence from each of the doctors testifying about collegial review and then you essentially had the complete absence a memory void if you will from Wexford and you didn't have you know except the take it as true that the documents that they were supposed to create they never created in that environment under rule 807 those documents should come in as an exception to the hearsay rule because they are corroborated by the testimony that's at trial and they are reliable evidence by a rule 706 expert appointed by a court so those could have been admitted for the full purpose under rule 807 that's my point all right I think we'll have to leave it there mr. Martin and we will give mr. Eden another eight minutes for his rebuttal thank you thank you your honor I'd like to address a couple points that you all have asked about first of all with respect to collegial review and whether it had any value there were two witnesses that testified that in fact it did one was dr. Barnett who was the plaintiffs expert and he said if you follow the guidelines it works in fact he also said cost-effective medicine is safe medicine but the jury issue correct mr. you know there was evidence on the other side if that were the only evidence about it your argument would be persuasive here but there was plenty of evidence on the other side for the jury to come out otherwise um your honor I agree with respect to how it was applied in this case there was other evidence as to how it was applied in other cases there was not and I think to deliberate indifference they would need to show that I think mr. you emphasize this in your brief to the quote that you just gave us cost-effective medicine it's good medicine but that seems wildly over inclusive to me it sounds like you would never give anybody you know medications or surgical interventions if you could just put them in hospice on palliative care and save a lot of money and you bothered and let them quietly pass away and and that's not the way we run our our medical system so it just seems over inclusive sometimes of course we don't want people to have unnecessary tests we don't want people to waste money but cost-effective medicine is good medicine is over inclusive your honor I agree if it's stated broadly but it was coming from the neck it was coming from an for the plaintiff that had been involved in California prison system for some time in fact I think work within that system and he was talking about the pluses counsel has said several different times during the argument today but it served absolutely no purpose at all on his own the only witness that he had that was a medical witness on his side to say that it wasn't a good policy didn't say that he thought it was but he did say as applied in this case which goes to the standard of care dr. Ritz of course said he thought it was a good policy and then this dr. Naylor who counsel and I'm sure he misspoke said that he'd been there for a long time and he witnessed how it worked and it didn't work actually he started December 2nd 2015 three weeks before he saw the plaintiffs so is his opinion I think and again I know I should wait mystery doesn't doesn't the collegiate review policy is not unconstitutional on its face so the only way in which it's unconstitutional is as applied there's two ways in which it can be applied unconstitutionally one is if you have a comparator or you have certain comparators the other way is if it's just applied as to the plaintiff in an unconstitutional way to lead to deliberate indifference which is what the judge instructed here when she said there was a known and obvious consequence of the application to the plaintiff of the policy described in paragraph 2 so you don't necessarily have to have a comparator to establish in eighth amendment violation in these cases under after how is that correct or do you disagree with me on that I disagree with you slightly your honor I think how did that make it how excuse me did not make it absolutely clear that just a few instances would be sufficient just to show that there was deliberate indifference and so how many times you would need I think this is addressed by actually judge Hamilton in this dissent in Hildreth and I think it's unclear but what he said in Hildreth it means that the plaintiff is going to have to find evidence that it applies to more than just his particular situation it has to go beyond that yeah I think yeah we also need to factor in our in bank decision in the JKJ case if it's a general policy as I say it's just sort of a we always do things slowly policy they're going to be some instances in which that doesn't cause harm to a person because they have a condition that can take a wait-and-see approach if they applied that policy to urgent medical problem however then it would be a problem and and and just adopting the one-size-fits-all might be the deliberate indifference I don't I don't disagree that there couldn't be an instance for that one instance that would apply where it could be deliberate indifference but here there was from the policy right well we're from right you know we always do this pointless collegial review you know sort of touch that base and it's not necessarily always terrible on its face is a very high standard to meet by the way the on its face standard means there isn't a single application of that policy that can be justified but I don't think there's any evidence here in this perhaps goes back to judge Santa Eve's questions that there's that the collegial review process here is what caused the delay the initial collegial review was on January 13th after dr. Einluner had recommended there be one and said I think this is an issue involving his kidney stones and then gave several recommendations if it hadn't been for the fact that the ultrasound was misread there actually it did show a mass which was testified to by our radiologist trial so if it hadn't been misread dr. May were and this is uncontradicted in this testimony I would have been on a totally different trajectory but what about the time from March 10 2016 when dr. Severino becomes involved they do a collegial review for his request a couple weeks later March 22nd then they have to have another collegial review about the nephrectomy then they have another consult another thing and the surgery doesn't wind up happening until July 19th and then we still have even more collegial reviews after that fussing around with whether we're going to do chemotherapy there's a built-in every step is slow and we have cases that say even a week of delay your honor I think I think this goes back to dr. Kirsch's but you asked earlier counsel about the intersection between how and dr. Severino and I think there is an intersection there that needs to be addressed once it was in dr. Severino's hands who he determined and he was an outside urologist that it was a non-emergent situation and he took control at that point and there had been a number of collegial reviews that have been approved along the way but there was absolutely no evidence that the delay caused in getting together a nine-person surgical team for a nine-hour surgery was caused by collegial review because he wanted to get the best group of physicians together so I think once he becomes involved that absolutely is important to consider both of the standard review which is standard care which the jury decided and deliberate indifference mr. is that a violation of the federal right did dr. Severino ever testify that there was harm that resulted from the collegial reviews after he got involved in the case I know there was quite a bit of scheduling the surgery and putting the ten person team together to ensure that mr. Dean didn't die on the table that it was a very involved in difficult surgery but does dr. Severino ever can never complain after March 10th 2016 that collegial review resulted in some harm to mr. Dean no were there any experts who testified to that your honor let me answer it this way the plaintiff's expert was asked and this was just expected delay initially he said and you have to consider this is a question asked as the treating physician the patient's medical history when ordering a diagnostic test right answer you do question and whether or not to order an ultrasound and specific situation involves an exercise of clinical judgment isn't that right it sure does Barnett says the same thing so we're not talking about decisions here that were so far out of the realm professional judgment when they don't like this witnesses are saying yeah I disagree with it it's not standard of care and then specifically to your honors question there was testimony about what harm delay caused from December 23rd to July 19th when I think the surgery is and there was testimony that yes they believe that that harmed him that was not back to Severino's testimony and that not that did not divide the time between December 23rd and when dr. Severino first got involved on March 10 all right I think we'll leave it there we appreciate the efforts of both counsel the court will take the case under advisement